IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RONALD WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:17-CV-376-MAB |
| | ) | |
| STEVE DUNCAN and JOHN COE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motions for summary judgment filed by Defendants Dr. John Coe and Steven Duncan (Docs. 64, 66). For the reasons explained below, the motions for summary judgment are granted.

### BACKGROUND

Plaintiff Ronald Williams is an inmate of the Illinois Department of Corrections ("IDOC"), currently housed at Stateville Correctional Center. Plaintiff filed this *pro se* lawsuit pursuant to 42 U.S.C. § 1983 in April 2017, claiming he was denied adequate medical care for glaucoma and a bunion at Lawrence Correctional Center in 2015 (Doc. 1, Doc. 7). Following a threshold review of the complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on the following claims:

> **Count 1**: Eighth Amendment deliberate indifference claim against Dr. John Coe and Warden Steven Duncan for delaying Plaintiff's referral to Marion Eye Center and/or delaying approval of right eye surgery for two months in 2015; and

**Count 2:** Eighth Amendment deliberate indifference claim against Dr. John Coe for denying Plaintiff special shoes for his bunion in 2015.

(Doc. 7). Warden Duncan also remained a Defendant in connection with Count 2, but only in his official capacity for the sole purpose of carrying out any injunctive relief that might be ordered (Doc. 7).

Defendants Dr. Coe and Warden Duncan filed their motions for summary judgment on February 22, 2019 (Docs. 64, 66). Plaintiff's response to the motions for summary judgment was due on April 22, 2019 (Doc. 72). On that date, however, Plaintiff's appointed counsel filed a motion to withdraw, citing an irreconcilable conflict with his client (Doc. 73). Following a hearing on the motion to withdraw, the Court granted the motion and gave Plaintiff 45 days to file his own *pro se* responses to the motions for summary judgment (Doc. 75). Plaintiff filed timely responses (Docs. 77, 81, 85). Dr. Coe filed a reply brief (Doc. 78), but Warden Duncan did not.

<u>FACTS</u>

Plaintiff was incarcerated at Lawrence Correctional Center from 2012 through 2019 (Doc. 65-2, p. 3; Doc. 91). Plaintiff is in his mid-sixties and has a variety of medical issues (*see* Doc. 65-2, pp. 3–4. Doc. 65-3, pp. 2, 19, 29, 69; Doc. 70-2). The conditions at issue in this lawsuit are his glaucoma and his feet. Dr. John Coe was the medical director at Lawrence during the relevant time period (*see* Doc. 70, p. 11), and Steven Duncan was the Warden (Doc. 65-1).

**A. Facts Regarding Plaintiff's Glaucoma**

On May 26, 2015, Plaintiff had an appointment with the optometrist at Lawrence,

Dr. Allan Brummel (Doc. 65-3, pp. 20–22). Dr. Brummel noted that Plaintiff had glaucoma and was using three types of eye drops, but the intraocular pressure in his right eye was "extremely high" (*Id.*; Doc. 65-2, pp. 8, 9).[1] Dr. Brummell requested approval to refer Plaintiff to Marion Eye Center to "evaluate current glaucoma medication and possible surgical treatment" (Doc. 65-3, pp. 20–22). Plaintiff testified that Dr. Brummel was "real excited like, you know, he's got to . . . get me up out of here," and Plaintiff was under the impression that he was going to be taken to the clinic that same day (Doc. 65-2, pp. 8, 9). However, Dr. Brummel marked that the referral request was not urgent (Doc. 65-3, p. 21). Dr. John Coe discussed the referral request in Collegial Review on June 2nd, and the request was approved (Doc. 65-3, pp. 20, 28).

On June 4th, Plaintiff filed an emergency grievance, indicating that the pressure in his right eye was very high when he saw the eye doctor on May 26th, and he had not yet been sent to an outside clinic for treatment like the doctor recommended (Doc. 65-4). He stated that he was now unable to see out of his right eye and was out of one of his eye drops (*Id.*). Warden Duncan received the grievance on June 9th and denied that it should be treated on an emergency basis (Doc. 65-4).[2] On June 12th, the Medical Records

_____

[1]  The intraocular pressure in Plaintiff's right eye was measured at 44, 53, and then 49 mmHg (Doc. 65-3, p. 22). The intraocular pressure in his left eye was measured at 26, 28, and then 29 mmHg (*Id.*). "Normal" eye pressure is generally considered to be less than 21 mmHg. BRIGHTFOCUS FOUNDATION, *Causes of Open-Angle Glaucoma*, https://www.brightfocus.org/glaucoma/open-angle/causes (last visited May 4, 2020).

[2]  The grievance was then submitted through the regular grievance process. It was received by the counselor on June 10th and the counselor responded five days later, stating "Per optometrist: offender has been approved to go on a medical furlough. Medication will be delivered on med line when it's due to be dispensed (Doc. 65-4; *see also* Doc. 65-2, pp. 20, 28). The grievance officer received Plaintiff's grievance on June 18th but did not respond until almost two months later on August 11th. He noted, in pertinent part, that Plaintiff had been seen six times by an outside eye doctor since he submitted his grievance on June 4th,

Department scheduled Plaintiff for a consultation at Marion Eye Center on June 29th (Doc. 65-3, p. 20).

Plaintiff testified that he complained to Warden Duncan on multiple occasions that Dr. Brummel's recommendation to send him to an outside eye doctor was not being followed (Doc. 65-2, p. 23). Plaintiff could not remember specifically when those conversations occurred, but he reasoned that it must have been sometime between his appointment with Dr. Brummel on May 26th and his first appointment at Marion Eye Center on June 29th (*Id.*). When asked where he was when those conversations occurred, he testified that he was "[p]robably on the yard" (*Id.*). He was then asked, "Do you not remember where you were?" and he responded, "Right. I'm just saying I talked to him - - I know I talked to him sometime on the yard. . . . I talked to him on the walk, you know, going on the pass, whatever, you know, stuff like that" (*Id.*). Plaintiff also testified "I think I . . . talked to [Warden Duncan] on his call line" (*Id.*   at p. 24). According to Plaintiff, the situation with his right eye was an emergency medical situation, which Warden Duncan should have known "after I talked to him . . . and after he seen my condition" (*Id.* at pp. 24, 26). Plaintiff described his eye as "rolling around in my head," "crooked," and "like a lazy eye, cockeyed, whatever you want to call it" (*Id.* at pp. 13, 29), by which he meant his right eye had shifted and did not point in the same direction as his left eye (*Id.* at pp.

and he concluded Plaintiff's medical concerns regarding his eye were being addressed (Doc. 65-4). The grievance officer recommended denying the grievance, which Warden Duncan concurred with on August 14th (*Id.*). Plaintiff appealed to the Administrative Review Board, where his appeal was denied on February 10, 2016 (*Id.*).

29–30). He testified that although Warden Duncan had the power to send him out for emergency treatment, he did not do so (*Id.* at pp. 26, 29).

Plaintiff was seen as scheduled on June 29th at the Marion Eye Center by Dr. Omar Ahmad (Doc. 65-3, pp. 43–47). Dr. Ahmad diagnosed Plaintiff with Primary Open-Angle Glaucoma (*Id.*).[3] Dr. Ahmad ordered, in pertinent part, that Plaintiff return later in the week for a consultation with a glaucoma specialist (*Id.*). Dr. Ahmad also called Dr. Coe to tell him that Plaintiff should be "seen urgently by glaucoma specialist" (Doc. 65-3, p. 34). That same day, Dr. Coe requested a referral to a glaucoma specialist, noting that Dr. Ahmad was "alarmed about the severity of [Plaintiff's] glaucoma" (*Id.* at p. 41). The referral request was marked as urgent (*Id.*). Dr. Coe's referral was approved by Collegial Review the next day on June 30th at 9:20 a.m. (*Id.* at p. 42, 48). Within forty minutes, the Medical Records Department had scheduled an appointment for Plaintiff with Dr. Ukeme Umana at Marion Eye Center on July 2nd (*Id.*).

Plaintiff was seen as scheduled by Dr. Umana on Thursday, July 2nd (Doc. 65-3, pp. 55–59). Dr. Umana diagnosed Plaintiff with severe, or advanced-end stage, glaucoma

---

[3] Primary open-angle glaucoma is the most common form of glaucoma in the United States. The eye's drainage canals gradually become clogged, causing fluid to buildup and increasing pressure inside the eye, which damages the optic nerve. Glaucoma first causes a loss of peripheral (side) vision and, over time, can also damage central vision. It usually develops slowly and without any symptoms or early warning signs, which is why it is often called the "sneak thief of sight." Many people are not aware they have glaucoma until they have significant vision loss. If left untreated, glaucoma can lead to significant vision loss in both eyes, and even blindness. AM. OPTOMETRIC ASS'C., *Glaucoma*, https://www.aoa.org/patients-and-public/eye-and-vision-problems/glossary-of-eye-and-vision-conditions/glaucoma (last visited May 4, 2020); Yvone Ou, MD, BRIGHTFOCUS FOUNDATION, *Primary Open-Angle Glaucoma*, https://www.brightfocus.org/glaucoma/article/primary-open-angle-glaucoma (last visited May 4, 2020).

(*Id.*). He recommended surgery "ASAP" (*Id.*).[4] On Monday, July 6th, Plaintiff saw Physician's Assistant Travis James for a follow-up visit at the prison (*Id.* at p. 54). PA James requested a referral for Plaintiff to Marion Eye Center for surgery, which was marked as urgent and signed off on by Dr. Brummel and Dr. Coe that same day (*Id.* at p. 60). The referral request was approved the next day on July 7th by Collegial Review (*Id.* at p. 61). On July 8th, the Medical Records Department contacted Marion Eye Center to schedule the surgery, but the person in charge of scheduling surgeries was out of the office (*Id.* at p. 62). A week later on July 15th, the Medical Records Department was able to schedule the surgery for July 28th (*Id.*).

Plaintiff underwent surgery for glaucoma in his right eye on July 28th as scheduled (Doc. 65-3, pp. 71–72). He received extensive follow-up care at Marion Eye Center for at least three years following his surgery (*see* Doc. 70-2). By the Court's count, he was seen over 25 times and had seven additional surgical procedures (*see id.*).

Plaintiff testified that an unspecified doctor at Marion Eye Center told him "If I got there sooner that they could have, you know, saved my eye" (Doc. 65-2, p. 30). The doctor did not, however, specify what "sooner" meant, *e.g.* a year earlier, a month earlier, a week earlier, etc. (*Id.*).

---

[4] The recommended surgery was a trabulectomy with Mitomycin-C OD (Doc. 65-3, pp. 55–59).

### B.  Facts Regarding Plaintiff's Feet[5]

Plaintiff is diabetic and has bunions on his feet and hammertoes (Doc. 65-2, p. 15; Doc. 77, pp. 65–68). According to Plaintiff, the IDOC began providing him with "special shoes" in 1996 (Doc. 65-2, p. 15; *see also* Doc. 77, p. 67). Specifically, he said he was given "some New Balance gym shoes" (Doc. 65-2, p. 15).

The medical records indicate that on January 31, 2014, Plaintiff told Dr. Coe during an appointment that he "want[ed] shoes. He has some old Nikes from family" (Doc. 70-1, p. 14). The medical records indicate that Dr. Coe ordered "wide shoes size 10 triple E" (*Id.*). There is no indication in the medical records that Plaintiff received any shoes following this appointment (*see* Doc. 65-3; Doc. 70-1). And a subsequent note in the medical records from a different provider indicates that "the special shoes were not approved" (Doc. 65-3, p. 9).

Dr. Coe saw Plaintiff again on March 12, 2014 (Doc. 70-1, p. 15). The doctor noted that Plaintiff had a growth on his foot that was getting larger and was not present during the previous appointment on January 31st (*Id.*). Dr. Coe thought it was "a wart which bled on the inside" (*Id.*). In the plan section of the notes, Dr. Coe wrote, "Remove as it rubs. Diabetic shoes requested. Size 10 [illegible]" (*Id.*). Plaintiff received these shoes on

---

[5] Plaintiff's side of the story regarding the shoes he was provided at Lawrence, as told at his deposition, was extremely difficult to follow (*see* Doc. 65-2, pp. 15–19). He was unable to clearly describe or differentiate between the various shoes he was given at Lawrence (*see id.*). He was also unable to recall with any certainty when the various types of shoes were ordered or how long he wore them for (*see id.*). As he tried to square his recollection of events with the medical records, his story became even murkier, disjointed, internally inconsistent, and difficult to grasp. For that reason, the Court has relied on the chronology of events presented in the medical records, and included supporting details the Court was able to glean from Plaintiff's deposition.

April 7th (*Id.* at p. 16). According to Plaintiff, these shoes were not gym shoes but rather shoes with a hard bottom and a soft top and soft sides (Doc. 65-2, pp. 16, 18). Plaintiff claims these shoes did not have any support for the bunion and were not suitable to recreate in (*Id.* at p. 17; Doc. 77, pp. 6–7).

Dr. Coe saw Plaintiff again on August 18, 2014, in pertinent part, to remove the growth from Plaintiff's foot (Doc. 70-1, p. 17). Dr. Coe noted "shoes not in size[;] he wants to put off lesion removal . . . will see back when shoes come in" (*Id.*). Dr. Coe ordered Plaintiff another pair of shoes, which were issued to Plaintiff on September 9th and "fit well," according to the nurse's notes (Doc. 70-1, p. 18). Dr. Coe then removed the growth from Plaintiff's foot on September 25th (*Id.* at pp. 18, 19). Dr. Coe indicated that it was a benign tumor, which was "no longer irritated with soft shoe" (*Id.*).

On December 29, 2014, Plaintiff saw Physician's Assistant (PA) Travis James and complained that he received the wrong size "orthopedic" shoes (Doc. 70-1, p. 20). Plaintiff said he received a size 11.5 instead of a size 10 (*Id.*). In the event that the shoes were the right size, then Plaintiff wanted insoles (*Id.*). PA James indicated that he was going to verify the size of the shoes that were ordered and issued to Plaintiff (*Id.*). He later noted that when the shoes were issued on September 9th, Plaintiff "reported they fit well at that time" (*Id.*). PA James indicated that no further action was required, and that Plaintiff could report to nurse sick call if he was still having an issue with his shoes (*Id.*).

On April 12, 2015, Plaintiff went to nurse sick call and reported that he needed new diabetic shoes because he received the wrong size; he got a size 11.5 but he needed a size 10 (Doc. 70-1, p. 21). The nurse left a note for someone to see if Plaintiff was right

(*Id.*). On April 21st, Plaintiff was called to the Healthcare Unit to receive a new pair of shoes that had apparently been ordered for him (Doc. 65-3, p. 6; *see also* Doc. 70-1, p. 22). There are no notes in the medical records as to when these shoes were ordered or who ordered them (*see* Doc. 65-3; Doc. 70-1), but according to Plaintiff, it was Dr. Coe (Doc. 1; Doc. 65-2, pp. 15, 16). The nurse noted that Plaintiff said the shoes "fit well" but he wanted gym shoes (Doc. 65-3, p. 6). Specifically, he said "I need a harder like gym shoes to support this area on my foot. The state have paid for my shoes for over 20 years. These fit better" (*Id.*). The nurse explained that the new shoes were the same size as the shoes issued to him on September 9, 2014: women's size 11.5/men's size 10 (*Id.*). Because the shoes Plaintiff received on September 9th were the same size as the new pair and still in good condition, the nurse did not issue Plaintiff the new pair (*Id.*). She further indicated that a doctor or nurse practitioner would review his chart (*Id.*). PA James did so two days later (*Id.* at pp. 9–10). He noted that Plaintiff "continues to request multiple shoes for his diabetes and has the belief that he is to be issued new shoes at his convenience" (Doc. 65-3, pp. 9–10). PA James went through the history of Plaintiff's complaints regarding his shoes and stated that Plaintiff received the appropriate shoes and they were in good condition (*Id.*). PA James concluded that "Plaintiff needs to purchase shoes. His last 4 commissary tickets show he has spent $95.46 since 3/2/15, mostly on food. He is not indigent. . . . He can buy gym shoes if he wants them" (*Id.*).

In May 2015, Plaintiff went to nurse sick call for his bunions (Doc. 65-3, p. 17). The nurse noted that he had been seen multiple times for his foot issues and had special soft-sided, felt shoes, but he continually wanted new ones (*Id.*). A bit later that same day,

Plaintiff stopped a nurse when he was out on the yard and said he needed to see the doctor about his feet (*Id.* at p. 18). The nurse noted that Plaintiff was wearing "a new pair of Nike tennis shoes" and "walking around yard [without] difficulty" (*Id.*).

In June 2015, Plaintiff asked a nurse "about getting diabetic shoes," who confirmed shoes had been ordered and delivered to Plaintiff (Doc. 65-3, p. 30). Two days later, he told another nurse that he wanted new shoes (*Id.*). In early July, Plaintiff asked PA James for insoles for his "orthopedic shoes" (*Id.* at p. 54). Later that month, Plaintiff filed a grievance regarding his shoes and asked that Dr. Coe order him "a good gym shoe, or black leather shoe, size EEEE" (Doc. 1, p. 16). In August, Plaintiff brought up the shoes again at a chronic care clinic visit with PA James (Doc. 65-3, p. 94). PA James told Plaintiff that he would review size 10 EEE shoes with Dr. Coe (*Id.*). PA James later noted "[Inmate] has [complained of] diabetic shoes that are too big and diabetic shoes that are too small. He reports the shoes that fit the best are 10 wide EEE. He reports the shoes he has now are too big. I suspect he will [complain] that new ones are too small but I'm ordering what he says fits best" (*Id.* p. 101).

In September, Plaintiff once again asked PA James for diabetic shoes (Doc. 70-1, p. 25). PA James referred the Plaintiff to the lab line to have his foot measured for new shoes (*Id.*). This was done two days later (*Id.*). PA James noted that Plaintiff's feet measured 10 inches long, his right foot was four inches wide and his left foot was 3 ¼ inches wide (*Id.*). PA James wrote that Plaintiff had an "ongoing shoe dilemma" and "we need to know how many pairs of orthopedic shoes [he has] in [his] possession" (*Id.*). Security took the shoes from Plaintiff's cell to PA James, and after measuring them he wrote, "they are

exactly the size he needs 11.5EEE" (*Id.* at p. 26). The encounter ended with PA James calling security to escort Plaintiff out of his office because Plaintiff was "hostile and belligerent" (*Id.*).

Plaintiff was then seen by Dr. Coe on October 21, 2015 (Doc. 70-1, p. 27). Dr. Coe noted that Plaintiff's shoes were "in good shape and fit fine. They are diabetic shoes. . . . No change in shoes" (*Id.*). No medical records beyond this date are provided by either party (*see* Doc. 65-3, Doc. 70-1). At the time of his deposition in September 2018, Plaintiff was wearing black shoes with Velcro straps provided to him by the medical staff at Lawrence (Doc. 65-2, p. 18). Although he did not clearly describe them, his testimony seemed to suggest they were the "gym shoes" that he had wanted all along (*see id.*).

## DISCUSSION

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

The Eighth Amendment's proscription against cruel and unusual punishment

imposes an obligation on states "to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 700 F.3d at 1072 (citations omitted). To succeed on a claim for deliberate indifference, a plaintiff must demonstrate that they suffered from an "objectively, sufficiently serious" medical condition and that the defendant acted with a "sufficiently culpable state of mind." *Id*.

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *See also Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 829 (7th Cir. 2009) (citations omitted); *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008). And "[a] prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In other words, "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting*, 839 F.3d at 662 (quoting *Farmer*, 511 U.S. at 837). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073 (citation omitted). It is "something akin to recklessness." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (2019) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

### A. PLAINTIFF'S GLAUCOMA

#### 1. Dr. Coe

Following the threshold review of the complaint, Plaintiff was permitted to proceed on a claim that Dr. Coe was deliberately indifferent when he delayed Plaintiff's referral to Marion Eye Center and/or delayed approval of glaucoma surgery on Plaintiff's right eye for two months in 2015 (Doc.7; *see also* Doc. 1). In his response to summary judgment, Plaintiff makes clear that his only issue with Dr. Coe is the initial referral to Marion Eye Center (*see* Doc. 77). Plaintiff argues that Dr. Coe was deliberately indifferent when he approved Dr. Brummel's non-urgent referral request because, according to Plaintiff, the situation was obviously urgent (Doc. 77, p. 5). Plaintiff claims that "[t]he delay caused by the referral not being processed as 'urgent' resulted in catastrophic loss of vision in [his] right eye" and states that his vision fell from 20/50 on July 2, 2015 to 20/100 on August 10th (Doc. 77, p. 5). Plaintiff also argues that Dr. Coe was deliberately indifferent for an additional reason, specifically that during the two months that he waited for eye surgery, Dr. Coe failed to "supervis[e[ his staff and ensur[e] Plaintiff had an uninterrupted supply of eyedrop meds" (Doc. 77, pp. 5–6).

Dr. Coe does not dispute that Plaintiff's glaucoma constituted a serious medical condition (*see* Docs. 66, 70, 78). Therefore, the only question for the Court is whether Dr. Coe acted with deliberate indifference to Plaintiff's serious medical needs. When it comes to medical professionals, the deliberate indifference standard has been described as the "professional judgment" standard. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). Treatment decisions are "presumptively valid" and entitled to deference so long as they

are based on professional judgment—meaning they are fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments—and do not go against accepted professional standards. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citation omitted); *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). A medical professional may be held to have displayed deliberate indifference if the treatment decision was "blatantly inappropriate" even to a layperson, *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (a jury can infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious."), or there is evidence that the treatment decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Petties*, 836 F.3d at 729; *see also Pyles*, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'") (citation omitted).

Turning first to Plaintiff's claim that Dr. Coe failed to supervise his staff and ensure that Plaintiff had an uninterrupted supply of eyedrops, the Court notes that these purported failures were not mentioned in the original complaint (*see* Doc. 1). Plaintiff was not permitted to proceed on a claim to this effect (Doc. 6). Plaintiff never amended his complaint to add such allegations. Defense counsel did not ask Plaintiff at his deposition about issues with his eye drops or Dr. Coe's purported failures with respect to the eye

drops (*see* Doc. 65-2). And Dr. Coe did not mention the eye drop issues in his motion for summary judgment; rather, his arguments pertain only to the allegations in the original complaint and the claim Plaintiff was permitted to proceed on (*see* Doc. 70).

      As far as the Court can tell, Plaintiff made no mention of this new factual basis for deliberate indifference against Dr. Coe until his response to the motion for summary judgment. However, a party cannot "introduce new theories of liability in opposition to summary judgment" or "add entirely new factual bas[e]s . . . not previously presented." *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (quoting *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014)). The Court finds that Plaintiff's introduction of a new factual theory in his summary judgment briefing is an "an unacceptable attempt to amend the pleadings through summary judgment argument." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018) (citations omitted); *see also Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017). Allowing Plaintiff to proceed with this new factual theory at this stage would require further discovery, additional summary judgment briefing, and unreasonable delay. Consequently, the Court will not consider Plaintiff's claim that Dr. Coe was deliberately indifferent by failing to supervise his staff and to ensure that Plaintiff had an uninterrupted supply of eyedrops, and deems this claim to be forfeited.

      The Court next turns to Plaintiff's claim that Dr. Coe was deliberately indifferent when he delayed Plaintiff's referral to Marion Eye Center. "[A]n inexplicable delay in treatment[,] which serves no penological interest" can constitute deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016). "Of course, delays are common in the

prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment" *Id.*

Here, Plaintiff was not seen at the Marion Eye Center until 34 days after Dr. Brummel recommended the visit. This delay is troubling given what the Court knows about the Plaintiff's condition in hindsight. But in order to hold Dr. Coe liable for the delay, Plaintiff must show that it was caused by Dr. Coe's actions (or inactions). *Walker*, 940 F. 3d at 964; *Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015). Plaintiff must also present "'verifying medical evidence' that the delay, and not the underlying condition, caused some harm." *Walker*, 940 F. 3d at 964 (citation omitted).

To begin with, no reasonable jury could find that Dr. Coe was responsible for the entire 34-day delay. Dr. Brummel—the eye doctor at Lawrence—submitted his request to refer Plaintiff to the Marion Eye Center on May 26, 2015. Dr. Coe discussed the referral request in Collegial Review one week after it was made and got it approved. The Medical Records Department took another ten days to get the appointment scheduled, but there is no evidence that Dr. Coe was aware of the scheduling delay or otherwise responsible for it. The appointment was scheduled for seventeen days out. This was presumably the earliest available appointment that was manageable for the prison, and there is no evidence that suggests otherwise. Accordingly, based on the evidence before the Court, a reasonable jury could only conclude that—at most—the first seven days of the delay is attributable to Dr. Coe's actions.

Plaintiff, however, did not present any competent, admissible medical evidence that Dr. Coe's seven-day delay in seeking approval of the referral request (or even the

entire 34-day delay in seeing an outside specialist) had a detrimental effect on his eyesight. *See supra* p. 6. And it is not self-evident from the medical records that it did.

Furthermore, plaintiff did not present any evidence from which a reasonable jury could conclude that Dr. Coe acted with deliberate indifference by waiting seven days to seek approval of the referral request. Plaintiff's condition during those first seven days was, without a doubt, extremely serious. But it is unclear whether it was urgent. Dr. Brummel said it was not. Plaintiff asserts that it obviously was. And by the time Plaintiff was seen at the Marion Eye Clinic on June 29th, the ophthalmologist also thought that Plaintiff's condition was urgent. But even if the Court assumes that Plaintiff's condition *was* urgent in the week after his appointment with Dr. Brummel, there is no evidence from which the Court can infer that Dr. Coe actually knew as much but failed to act. Dr. Coe is not an eye doctor. His background is as a family physician.[6] There is no evidence as to what a trained family physician or a prison Medical Director could typically be expected to know about glaucoma and its progression in general. And there is no evidence as what Dr. Coe himself specifically knew. In other words, was he reliant on what the optometrist told him or did he know enough to second-guess the optometrist and recognize when a particular inmate's condition necessitated urgent treatment from

---

[6] There is no deposition or affidavit from Dr. Coe on the record in this case. However, he has been deposed in many other lawsuits filed by prisoners. In those depositions, Dr. Coe testified that his residency was in family practice, he is board certified in family practice, and he worked for decades as a family physician before going to work as a physician in a prison. *Holtz v. Martin*, SDIL Case No. 14-367-NJR-DGW, Doc. 81-1, p. 3; *Gabb v. Wexford Health Sources, Inc.*, SDIL Case No. 15-1415-JPG-DGW, Doc. 56-2, p. 3; *Cox v. Wexford Health Sources, Inc.*, SDIL Case No. 16-137-SMY-RJD, Doc. 87-5, p. 3; *Harvey v. Duncan*, SDIL Case No. 16-343-NJR-DGW, Doc. 65-1, p. 2.

an outside specialist? There is also no evidence as to what Dr. Coe knew about Plaintiff's condition, in particular. Plaintiff did not develop any evidence as to what, if anything Dr. Coe reviewed in his optometry records or discussed with Dr. Brummel about Plaintiff's condition. Simply put, there is a complete dearth of evidence from which a jury could draw the required inference about Dr. Coe's state of mind.

Because the progression of glaucoma is not the type of medical issue that is within a layperson's realm of knowledge, it was not obviously wrong and blatantly inappropriate for Dr. Coe to wait seven days to run the referral request up the chain of command. There needs to be additional evidence that suggests Dr. Coe's decision to wait seven days before acting on the referral request was a substantial departure from accepted medical judgment, but Plaintiff provided nothing except his own speculation. For these reasons, no reasonable jury could find that Dr. Coe acted with deliberate indifference by delaying Plaintiff's referral to Marion Eye Center. Consequently, Dr. Coe is entitled to summary judgment on Count 1 of Plaintiff's complaint that he was deliberately indifferent to Plaintiff's glaucoma.

### 2. Warden Duncan

Plaintiff claims that Warden Duncan was deliberately indifferent to his serious medical needs because Plaintiff told him that he had not been sent to an outside specialist as Dr. Brummel recommended but the Warden failed to order emergency treatment for Plaintiff (Doc. 65-2, pp. 23, 28).

When it comes to non-medical officials like Warden Duncan, it is well-established that these officials are entitled to defer to the judgment of the medical professionals. *E.g.,*

*Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005).

> If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.

*Arnett*, 658 F.3d at 755 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). However, non-medical officials can be held liable for deliberate indifference if they ignore the prisoner's complaints or "have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes*, 546 F.3d at 527 (quoting *Spruill*, 372 F.3d at 236); *see also Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006); *Greeno*, 414 F.3d at 655–56.

Here, Plaintiff claims he complained to Warden Duncan on multiple occasions that Dr. Brummel's recommendation to send him to an outside eye doctor was not being followed. Plaintiff further claims it would have been obvious from a face-to-face conversation that his condition was an emergency because his eye was "rolling around in my head," "crooked," and "like a lazy eye, cockeyed" (Doc. 65-2, pp. 13, 29). However, Plaintiff could not remember with any modicum of certainty when those conversations occurred, where they occurred, or what was said. *See supra* p. 4. As such, his testimony is simply too vague and hedged to allow any factfinder to conclude that he had spoken face-to-face with Warden Duncan.[7]

---

[7] *Szymanski v. Rite-Way Lawn Maint. Co.*, 231 F.3d 360, 364 (7th Cir. 2000) ("[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the

It is undisputed, however, that Plaintiff submitted an emergency grievance to Warden Duncan dated June 4, 2015, complaining that he had not been seen by an outside specialist yet. Warden Duncan received the grievance on June 9th. By that time, the referral request had been approved. And three days later, the Medical Records Department scheduled Plaintiff's consultation at Marion Eye Center. The medical staff was addressing Plaintiff's need for treatment and the warden was justified in believing that the prisoner is in capable hands, particularly since there was no obvious indication from the medical records that the treatment was not being provided in time-appropriate manner. Warden Duncan did not have to do anything further. *Arnett*, 658 F.3d at 756 ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service.") (quoting *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009)).

Consequently, Warden Duncan is entitled to summary judgment on Count 1 of Plaintiff's complaint that he was deliberately indifferent to Plaintiff's glaucoma.

## B. PLAINTIFF'S SHOE ISSUES

Following the threshold review of the complaint, Plaintiff was permitted to proceed on a claim that Dr. Coe was deliberately indifferent when he refused to prescribe special shoes for Plaintiff's bunion in 2015 (Doc. 1; Doc. 7). In his response to the summary

---

motion."); *Dale v. Lappin,* 376 F.3d 652, 655–56 (7th Cir. 2004) (Jones who offered concrete details in a sworn statement submitted enough to defeat summary judgment, whereas vague assertions are not sufficient to create a genuine issue of fact); *Harvey v. Maytag Corp.*, 105 Fed.Appx. 863, 868 (7th Cir. 2004) (plaintiff's "vague recollection without any specific dates or details" was not sufficient to establish genuine issue of fact).

judgment motion, Plaintiff specified that Dr. Coe was deliberately indifferent when he refused to order a pair of shoes for Plaintiff and told Plaintiff that he could buy his own (Doc. 65-2, p. 15; Doc. 77, pp. 6–7).

Neither Dr. Coe nor Warden Duncan initially disputed that Plaintiff's foot issues constituted serious medical conditions (*see* Docs. 64, 65, 66, 70).[1]  However, Dr. Coe made the argument in his reply brief for the first time (Doc. 78, pp. 3–4).[8] The Court need not decide whether Plaintiff's bunions constituted a serious medical need because even if the Court assumes that it was, Plaintiff has failed to demonstrate a genuine issue of material act as to whether Dr. Coe or Warden Duncan acted with deliberate indifference.

According to Plaintiff, Dr. Coe refused to order him shoes and told him that he needed to buy his own. However, Plaintiff's testimony on this issue was extremely vague and he could not recall any specifics as to when Dr. Coe made this comment (*see* Doc. 65-2, p. 15). Furthermore, Plaintiff's story is not supported by the medical records, which show that it was PA James who made this comment in April 2015, not Dr. Coe (*see* Doc. 65-3, pp. 9–10).

A review of the medical records demonstrates that Dr. Coe was anything but deliberately indifferent to Plaintiff's foot issues. Specifically, Plaintiff saw Dr. Coe for the

---

[8] Arguments raised for the first time in a reply brief are normally not considered. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.") An exception exists, however, when the reply is prompted by an argument raised in the response brief that was not addressed in the initial motion.  *Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 640 n. 2 (7th Cir.2001); *Matter of Wildman*, 859 F.2d 553, 556 n. 4 (7th Cir.1988).

first time about his shoes on January 31, 2014, and Dr. Coe ordered "wide shoes size 10 triple E" (Doc. 70-1, p. 14). Plaintiff saw Dr. Coe again on March 12, 2014, and Dr. Coe ordered "diabetic shoes" (Doc. 70-1, p. 15), presumably because the gym shoes were not approved and/or Dr. Coe believed Plaintiff needed footwear that would accommodate and not irritate the growth on his foot. Plaintiff next saw Dr. Coe on August 18, 2014, and reported that the shoes were not the right size, so Dr. Coe ordered another pair of shoes (*Id.* pp. 17, 18). After Dr. Coe removed the growth from Plaintiff's foot on September 25, 2014, he did not see him again for over a year until October 21, 2015 (*see* Doc. 65-3, Doc. 70-1). During this time, Plaintiff's shoe saga continued but there is no indication from the medical records that Dr. Coe was involved. Plaintiff was unhappy with the type of shoe he was given and the fit of the shoe, all the while multiple medical providers documented that the fit was fine. Dr. Coe then saw Plaintiff on October 21, 2015 when, like the other medical providers, he determined that Plaintiff's shoes were in good shape, fit fine, and no change in shoes was needed (Doc. 70-1, p. 27).

A prisoner is "not entitled to demand specific care and is not entitled to the best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (citation omitted). Prisoners are only "entitled to reasonable measures to meet a substantial risk of serious harm." *Id.* The medical records indicate that Plaintiff was being seen regularly by medical staff to evaluate his shoe needs. Dr. Coe's decisions regarding Plaintiff's footwear were not blatantly inappropriate and Plaintiff did not submit any other evidence that the decisions were a departure from accepted medical practice, let alone a *substantial departure*. Rather, the record suggests that Plaintiff simply did not like the type of shoe

Page 22 of 23

that was ordered for him and he wanted something different. Consequently, no reasonable jury could find that Dr. Coe was deliberately indifferent to Plaintiff's foot issues. Dr. Coe is entitled to summary judgment as to Count 2, which means Plaintiff's claim for injunctive relief is dismissed and Warden Duncan is likewise dismissed as a Defendant in his official capacity to Count 2.

<div align="center">C<small>ONCLUSION</small></div>

The motions for summary judgment filed by Defendants Dr. John Coe and Warden Steven Duncan (Docs. 64, 66) are **GRANTED.** Plaintiff's claims against them are **DISMISSED with prejudice** and judgment will be entered in their favor.

There being no claims or Defendants remaining in this action, the Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.


**IT IS SO ORDERED.**

**DATED: May 5, 2020**

<div style="margin-left: 40%;">

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**

</div>